Good morning. Our first case for today is case number 416-0832. In re Marriage of Morrow for the appellant we have Ms. Cherry and for the appellee we have Mr. Skye. Are you ready to proceed counsel? Yes. Please do. Thank you. May it please the court and counsel. First issue that we've raised and which I'm going to address is the issue dealing with the apportionment of the marital estate using a total offset valuation for the pension of Mr. Morrows. We would submit that in order to, as a matter of law, in order to use the total offset method there needs to be a value that can relatively accurately be placed on the pension. You can't apportion something without a value. You can't do an offset without a value for that pension. And this is pursuant to Wisnowski, Hunt, and a plethora of other cases that have addressed using a total offset as opposed to a division if, as, and when received. Well, counsel, do you dispute the value that was attributed? I know that there was an analysis done retiring at 60, retiring at 65. Are you disputing those numbers? I am disputing the use of the valuation at age 60 for two reasons. First is, Judge, the evidence is not that Mr. Morrow is not going to retire at age 60. And that valuation is only as good as the retirement age that you use because the whole cash flow, the whole valuation of the present cash flow is based on he's going to receive this cash flow over a period of time. The date that that cash flow begins affects substantially the value that is placed on it. In fact, the two values that were used, that were introduced in this case, and by the way, they weren't stipulated to as being the value that the court should use. But they were stipulated to as these are the values that are arrived at using this methodology and assuming the retirement age of 60 and assuming the retirement age of 65. And if you look at those two, there is a substantial difference in the value of the pensions just as a result of the different retirement age. With regard to the full value of the pension, there is over a $200,000 difference in value. And for the marital portion, there is a $90,000, something over $90,000 difference in value. So there's a substantial difference in value by using the earlier retirement age. And in this particular case, first of all, under Wisnowski, where there is a discussion of yes, you can use evaluation and do a total offset, it's specifically discussed that that should be when the retirement is mandatory or imminent. And in this particular case, it wasn't mandatory. What was the evidence of when your client did plan to retire? There was the testimony of my client that he did not plan to retire at age 60. And in fact, the evidence was if he did retire at age 60, he'd have a decrease in income. In order to keep his income, he's going to maintain his employment. In the brief of Dr. Green, there was a statement that there was evidence that the was no testimony that that's the customary retirement age. I don't know what the customary retirement age is for the state of Illinois employees. I mean, there are people on the bench here who technically work for the state who have not retired at age 60. I haven't retired at age 60. That's anecdotal. That's not in the record. But the only testimony was an employee with eight years of employment can retire at 60 without a reduction of pension benefit. Doesn't mean they don't have a reduction of income. And so the only evidence with regard to when Mr. Morrow would retire was that he was not going to be retiring at age 60. And he was eligible for retirement at the time of the hearing. Is that right? He was eligible because he had been working for the state a sufficient period of time to meet the rule of age 85. But again, if he did that, his income would be even less than it would be if he waits until 60. And even then, it's not going to be what he's earning at the current time. It also has the fact that he wouldn't be getting Social Security yet. It would reduce his ultimate Social Security benefit. There would be a lot of financial detriments to him retiring at age 60. And again, that retirement at age 60, first of all, his retirement was not imminent. It's argued in the brief for Dr. Green that, well, if he retires at age 60, that's in four years, that's imminent. I don't agree that that's imminent. But beyond that, it basically begs the question or presupposes, I'm not sure what the term is from logic, but it presupposes he retires at 60. And if he's not going to retire at 60, retirement is not imminent. In our brief, I go through a number of cases that talk about the unfairness of setting a value which assumes certain things that, when they don't occur, are to the detriment of one of the parties. And here, Mr. Morrow, if you look at the division of the marital assets, of current assets, the equity in the residence, the value of the partnership interest in Springfield Clinic, the life insurance and bank accounts that each parties are getting and the debts that they are each receiving, so Dr. Green was going to be receiving, aside from the division of the 401k account, $279,349 worth of assets. Mr. Morrow was going to be receiving $4,604 of assets. But how much was he receiving from the 401k account? That was being equally divided. But of the current assets, not retirement assets, that's what he's receiving, $4,604. So the only way that that could be an equal division is by using this value, using the age of 60 for retirement to offset all of the equity that Dr. Green is receiving. And just because it's convenient, it makes things work out nicely, doesn't mean that that's the value that is proper to use. And we submit that is not the value that's proper to use. It's not proper to assume his retirement at age 60. And it's not proper, certainly, to do an offset, assuming that retirement at age 60. It seems your position really is that use of the offset was improper. You're not really disputing the values, it seems. Is that right? What our position is that using an offset was not proper because the value couldn't be fixed, and you have to be able to fix the value in order to do the offset. That it should have been divided if, as, and when received. Now, if it's determined, well, it still could be used to do an offset, I would submit that using the value at age 60 was improper. Further, we submitted at trial a value using, presuming at 65. Because that is an age that the courts have recognized, okay, that's normal retirement age. That's an age we'll recognize as retirement age if you want to try to modify maintenance or child support because of your reduction of income. We'll recognize that. Something earlier than that, that's early retirement. So if there is going to be an offset, if this court says it's still proper to do it even though you can't really fix the value, we submit it's still wrong to use the value of retirement at age 60. At earliest, it should be age 65. And I note that, actually, you don't get Social Security at age 66. But to put on Mr. Morrow, to make him subject to basically a reduction of what he's getting out of the marital estate, if he delays his retirement, which, in order to meet his living expenses, he will need to do, is not appropriate. And again, if you can't fix the value, it's improper to do the total offset method of division. In the brief for Dr. Green, there is a citation to this court's decision in in-ring marriage of Wiley as stating that there's no But in Wiley, there was not an issue of the value of the pension. The only issue was, was it proper for the court to offset the husband's pension with the equity of the house? So it's not the same issue as in this case, which is, there is a dispute with regard to the value, and you cannot really fix the value, certainly not using the age of 60 for retirement. So while it may be no bright line in terms of the court's exercise of discretion, when there's proper values that can be used, that's not the case here. There wasn't a proper value to be used. There is also argument in Dr. Green's brief that, again, it was good to use the retirement age of 60 and the valuation based on that age, because it made things work out conveniently. She didn't have to then make a payment to him for equalization of equity. But, again, as I mentioned earlier, I don't believe that's the test for whether it's proper to use a valuation at age 60 or any valuation where the evidence doesn't support that speculation of retirement age, just because it's convenient. But beyond that, Dr. Green was receiving a marital residence which had no mortgage against it. She had debt that she had incurred during the separation, but that was largely, we would submit, a result of choices that she made. She bought a vacation home. She had ample income to meet the expenses that she evidenced were her appropriate living expenses, and just the fact that she spent more than she could afford is not a basis for depriving Mr. Morrow of his equitable apportionment of the marital estate. I would also state that, or submit that, if it would be proper for the court to use the valuation at age 60, then the court should also have reserved jurisdiction to address a warrant of maintenance at that time, because as the evidence is right now, Mr. Morrow will have a reduction of income from his income now. Even as it is now, his income is substantially less than Dr. Green's, and his income is less than enables him to meet his living expenses at the current time, or if he pares things down, maybe just barely. Reduction of income, he'll have even less available. So if it is proper to say, okay, we're going to assume that you retire at age 60, then there should be some reservation of jurisdiction to address maintenance, so that he has income to live on if he does, in fact, retire at age 60. To do otherwise means that he's going to get penalized if he doesn't reduce his income, and he won't have adequate income. Unless there are any further questions on that argument, I will move to the second argument, which has to do with the value that was placed on the interest that Dr. Green had in Springfield Clinic. The evidence was that the clinic, pursuant to the terms of the partnership agreement, does a valuation of partners' equity in the clinic at the end of every year, December 31st of each year. And there was a value that had been set on her interest in the clinic as of December 31st of 12. But subsequent to that, and prior to the divorce, there had been a sale negotiated for one of the assets of the partnership. And as a result of that, it was clear that the, first of all, that the valuation that was done as of December 31st didn't accurately reflect the value because it didn't include the full value of this asset of the corporation. As a result of her ownership interest in the clinic, in the marriage, Dr. Green was going to be receiving an increase in the value of her, they were going to attribute that increase, there already was an increase in the value, but she was going to receive that attributed to her over five years. So a five-year vesting schedule, as it's called in the brief for Dr. Green. The fact that something is subject to a vesting schedule does not make it not marital. It's still marital. Pension, vested or unvested, is still marital. Stock options, even though you don't have the ability to exercise them, even if it's contingent on some further conditions, it's still marital. Royalties, even though you don't receive them until after the divorce, if they're the result of earnings from a marital asset, it's still marital and it's still an asset to be divided. Now here, the sale took place on the same day that the judgment of disillusion was entered, is that correct? I should say the division of the property because they actually had a judgment as far as the marriage earlier, but... No. Okay. The chronology was this. First of all, I don't agree with the statement of when the sale took place. The final execution of documents was on March 4th of 2013. The sale had been negotiated before that. It had been approved by the partnership before that. My question is, when did they finalize it? March 4th of 2013 is the date that the judgment of disillusion of marriage was entered. And that was the date based on the law that was in effect at the time of this trial that was being used as a valuation date. So it was that same date. But first of all, as I said, the sale had already been negotiated before that. Further, what she's receiving is the result of what she owned in the marriage as of the date of divorce prior to the date of divorce. So it's still a marital asset. The fact that the papers weren't signed until March 4th doesn't mean that it's not a marital asset, and it's something that she's receiving as a result of that marital asset. I'm wondering, could they have not gone through with the sale? I'm sorry? and the agreement, but I guess I'm looking at it as until you sign on the dotted line and everything is finalized, is that appropriate? First of all, Your Honor, I don't believe there's evidence that as of March 4th, it could be backed out from at that point or not. There really isn't evidence one way or the other. What we do have is the bylaw saying they had presented to the partnership, the partnership had approved the sale, and had directed the executive officers to take the steps necessary to complete the sale. Number two, nobody backed out. It took place. And so the value that's being received for that asset that was owned by Dr. Green during the marriage is still being received. The only risk of her not receiving it would be if she ceased to be employed by the clinic. Now, two increases in equity had already occurred at the time of trial, and those were included by the judge in the valuation. The third was about to occur the next month. We had our trial in November. December 31st, the equity bumps up. So that one was almost to fruition. There was no evidence that she was going to leave the state, excuse me, the clinic. And even it, so that should have been included. Then there were two more to occur after that. Well, if it's speculation to try to figure out when your client's going to retire, isn't it speculation to decide whether or not she's going to stay there for five years? Which she would be required to do in order to gain, reap the benefits, full benefits of the valuation. And that would be a reason to do what is done with stock options, which is to say, if, as, and when, then we have the payment occur. So there was two ways to do it, and I don't think we're being inconsistent in saying defer the, if and when received, he gets his payment for half of the equity that she received. The alternative was we proposed a number which wasn't the full amount of what she received, because she was receiving equity increases of $4,589 each of the five years. Plus she had also received a $6,000 payment, which she, to use to pay the tax on the capital gain. And in terms of doing an offset sort of thing, we proposed using the value of the capital gain, which was something less than the combined values of those. But the other thing we proposed is just if, as, and when, because we recognize there's a risk that she might leave the clinic, that he get the payment, which is what's done with pensions, which is what's done with stock options, which is what's done with royalties. Unless there are any other questions on that issue, I'll move to argument three, which has to do with the determination of the court to offset the maintenance that he found appropriate to award Mr. Morrow by an amount for child support as a result of which Mr. Morrow received no maintenance. We have a case here where Mr. Morrow's earning income was about $95,000 a year. Dr. Green's income was approximately $300,000 a year, substantially more than Mr. Morrow. If one was going to view it without the issue of child support, if there were no children, then we would submit that an amount of maintenance over $2,000 a month would have been appropriate. In fact, one of the... Counsel, I'm sorry, you're out of time. You will have time. I'll rebuttal, though. Thank you. And I otherwise stand on the briefs. Thank you. Thank you. Mr. Scott? Please, Court. Counsel, I'd like to correct one thing at the very beginning. Ms. Cherry indicated that her client never acknowledged that the normal retirement age for state employees is 60. And I would refer the court to not only our brief on page 10, but also the record, page 894. In fact, it was Ms. Cherry that asked him the question, is the normal retirement age 60? Is that correct? His answer was normal retirement age is 60 with eight years. So not only did he acknowledge it in the record, but Ms. Cherry asked him that. The question that I think was submitted to the trial court is that you had two different valuations that were actually put into evidence. It wasn't like we're guessing that these figures are not accepted into evidence. They were accepted as two separate exhibits. And I would ask the court to take a look at the stipulation because the stipulation was very specific. And it basically was to prevent either one of the parties having to hire an accountant to come in, which is normally what happens, and to put in that evidence. And the stipulation says that the methodology of the value was using a method customarily used by accountants in central Illinois for giving an opinion of present cash value. The second thing that it says is that the estimates represent a calculation of current value of the cash flow in the pension payments, which assumes a date of death using generally accepted actuarial tables and presumes pension payments from the date of pension begin to the date of death. The last thing it says is that the rate that the parties stipulated to is the customary rate used by accountants that would be valuing this. So what we submitted to the judge was you have two present values. And Mr. Morrow says, oh, I'm not going to retire at 60. I'm going to have this massive loss of income. I can't retire. The judge obviously didn't accept that. And I think there were some legitimate reasons as to why he did not accept that. So before you go on, I'm sorry. So that's why I was asking the question. Based on the stipulation, it seemed to me the parties were in agreement as to the assessment of the value if you retire at 60 and if you retire at 65. Was that your understanding? That's my interpretation, Justice, because that's exactly what the stipulation says. Now there is a provision in the stipulation that says this stipulation doesn't mean it's okay to use the total offset method. But in the cases that have been cited to this court, and especially in the Wiley case, it says that's an option for the court. It is a legitimate option. So the question to this court is did the court abuse its discretion in taking that option? And as I submitted in our brief, and it's our position, the court did not abuse its discretion because it was reasonable in these circumstances. And it's like all these type of cases are all fact-specific. And in this circumstance, it was very reasonable for the court to adopt this total offset approach. It would have been reasonable to do the other, too, wouldn't it? Totally. But that was a discretionary decision by the court. And the question to this court is was that an abuse of discretion? Would no reasonable person have taken the approach that the trial judge did? And I don't think that this court can find that. What evidence is there to suggest that respondents' testimony about I would suffer a reduction. I do not intend to retire at age 60. My plan is to work longer. That plan is based upon my income needs. The evidence, Your Honor, and I laid this out in my brief, there's two things. First of all, you examine what his expenses are. And as I pointed out to the court, just during the time of the pendency of the dissolution, this man paid $81,488, almost $81,500, on assets that he said had zero junk value. The storage fees. His storage fees. And he continued to do that. He did it from, we showed the two affidavits to the court from the very beginning through the time of trial. And he claims, I couldn't dispose of them because they have some hazardous materials. 44 months and you can't drop one storage bin? You can't clean one out? The problem was that he wanted to do that. He had discretionary expenditures every month of 1852. Thrown it away because that's his choice. So you look at that and you look at what else he was doing. He was paying nothing for these kids except $500. At the end of this, the judge's ruling, he's paying nothing for them. He wouldn't contribute to the ADHD medication. He wouldn't contribute to any counseling. He wouldn't contribute to any medical. He wouldn't contribute.  Because of having a nanny that runs around and covers her schedule when she's on call. And because of her practice, she gets called out. Excuse me, at night, on holidays, other days. Now that was what the parties agreed to, right? Oh, yeah. I'm not criticizing that. But that's part of her expenses are that. And his expenses, Your Honor, in answer to Justice Knax, he had the ability to put $600 a month into a deferred comp account. Presuming he's still going to be able to do that. But at least as of the time of trial, calculation-wise, it was $26,000 that he could use to supplement his retirement, his pension. Was he still residing with his mother? Yes. In his mother's home, very little expense. With regard to other assets that he had, he received $230,000 of my client's 401k plan. Again, four years buildup money that would supplement. He also had $65,000, almost $66,000 in a non-marital IRA. He had over $321,000 that would supplement any of his pension. Now, what would be the penalty if he accessed that 401k? At age 60, there would be no penalty. Tax-wise, it would be taxable to him. But there would be no penalty because he's over 59 and a half. In addition, his pension was $3570 at the time of the dissolution. And that's two and a half years before the court heard the final trial. So that pension has grown. It would grow the other four years because he was 56 at the time of trial. And for a trial judge, he's sitting there looking at a guy who has, I believe, his expenses, which included his... He had total, I think, of about $5,000 of expenses a month, which included almost $2,000 for these storage units. I don't see how his lifestyle is going to change much. I don't see how he's going to not be able to retire. If he chooses personally not to, that's his choice. The question is, did the court, taking the whole picture that we have before it, make an error or abuse its discretion, I guess is a better phrase, in making this selection? I don't think so. It's definitely in the evidence. It was his choice. I don't think anybody can criticize the court. One of the things that we brought out in our argument was the fact that if you look at the assets that were available to offset, which all courts do, how am I going to move this over here or that over there and still let both people survive? Ms. Cherry says, my client got all the liquid assets. Well, the judge was aware that we had a divorce in 2013 and we're here in November of 2015. November of 2015, my client doesn't have liquid assets, even though the list of assets in 2013 showed there was some money in the bank account. There was a mortgage against the house in 2013, which my client paid off during that time period. But she also had a substantial reduction in income in 2015. She lost $10,000 a month for six months. So Ms. Cherry's figures about her having $300,000 in income for the court to kind of balance and make determinations on didn't work for 15. She had about $249,000 if you look at our Petitioner's Exhibits 2 and our affidavit, which is 1. Additionally, my client, because she's paying for everything, despite whether or not the income goes up or down, she had to borrow against all the life insurance, which Ms. Cherry says is liquid, and she was only able to pay interest only. To make her payment, which is mandatory for the clinic's partnership interest to continue into her profit sharing, she had to borrow the money. To pay her taxes, she had to borrow the money. And she was, in essence, paying interest only on a lot of these because that's all she could afford. So that's something the court had to take into account. She could have, I guess, liquidated the house, but where were her and the kids going to live? And it was a $100,000 house. It wasn't an extravagant house or one of a lot of money, but what she would have had to replace that with, she would have had to go out and try and do that, and he would have had the whole house. He could have given up the rest of her retirement, but then she's left with next to nothing in retirement when she turns retirement age, and she doesn't have a guaranteed pension like Mr. Morrow. So when you step back and you go, does this make sense? It truly does. Can you fault the judge for doing that? I don't think so. I believe that the court made the proper decision with regard to valuation. It was based upon evidence. I think the court made the proper allocation of property based upon the evidence. The next issue is the issue with regard to jar dogs. That's what I call it. That's the add-on. There was uncontradicted evidence that on the day of the judgment, March 4, 2013, if Dr. Green had sold at that date, this is what you'd get. Sell your partnership interest. It's $147,000. We included two payments in our final argument, kind of an equity type of approach. Probably shouldn't have, but we did, and moved it up to $156,000. The judge included that. Now Mr. Morrow says, wait a minute. The judge erred because I'm entitled to another $6,800 if you read his brief. That is almost seven-tenths of 1% of the marital estate that we are arguing about, that this judge somehow created an abuse of discretion in his allocation. I can't see where this judge taking the approach that, wait a minute. I'm not going to include those other three years where she has to work for the clinic, she has to not die, and she has to be there each year to collect. The other thing that I mentioned in my brief is, honestly, if you get this asset added to the clinic, because that's what happened, on the day of the dissolution, is that marital or non-marital? I guess if they signed the papers at noon and the dissolution was at 10, none of those facts I have, but no question, right? I'm agreeing with you, Justice. It's like the deal. You have this great negotiation. I'm going to buy this object or I'm going to sell this object until it's signed, it's not sold. But on the day of the dissolution, when all property ends and all property is divided, this asset did not, or may not, have been included in the clinic assets. Taking the approach we did, I think, was equitable. I think the court's acceptance of that was equitable. I think that the court should not be reversed on that. The issue of maintenance is one that I think the court did an excellent job on. You're looking at a person, and some of the figures that were contained in the argument of Mr. Morrow don't hold up. Look at my client's affidavit. She has almost $4,500 in expenses for those kids each month. She only got $500 a month from Mr. Morrow during the time of the pendency of these proceedings. The judge had found in his final order that it was $1,500 was a reasonable child support-based fund, his $95,000 salary. He, in essence, paid $47,000 less than what he should have been by this case and after the dissolution. He's got another $6,000 of after-tax money. He can do what he wants to. He has the money to be able to still contribute to his 401k or his deferred comp. Additionally, the court made a bunch of findings that I think are important when you analyze whether or not this court abuses discretion. He went through the factors. These people didn't have an extravagant lifestyle. The judge, looking at the whole picture, says, when I'm finished, Mr. Morrow will be able to maintain his lifestyle. Dr. Green will be able to maintain her lifestyle. Both parties will be able to maintain their lifestyle. They both earned significant enough money to do that. Dr. Green's lifestyle is one that is to pay all the debt that she has and to pay for all the children's expenses without any assistance from Mr. Morrow. The other thing that I think is important is, once again, when you look at his affidavit, what are his true expenses? He says, I need to go buy a house that's more valuable than the one that Dr. Green lives in to support my claim for maintenance. Never did that. Hadn't done it in 44 months. Now he needs to go do that. Now the divorce is over. He says, I need money from her so that way I can keep throwing away $1,852 a month because that's my lifestyle, because that's my choice, because I come to the court and I say, this is worth zero. But I spend almost $30,000 a year on zero. That's my lifestyle. So when a court sits back and goes, what am I supposed to do with this? And the court says, hey, if I was going to award maintenance, I would give you $2,000 because that would cover what I perceive you would need, and I would do that for six years, 132 months. Then he looks down and he sees that we have these two little kids here, and you would owe them $1,500. Reasonable. And he says, you should get a check for $2,000, pay taxes, and as Ms. Cherry pointed out, net $1,424 a month after taxes, and then you should write a check to Dr. Green for $1,500. Does that make sense? No. Because over that six years, these kids are still going to be minors. They're still going to be around needing support. And he's going to say, oh, well, maintenance is over. So he benefits. He actually makes more money, 70-some bucks, more a month, by what the judge did instead of you get one check, you get the other. I think the judge stepped back and made a reasonable decision for these people in this situation. And Mr. Morrow wants to say, wait a minute. If I retire early, I want to come back and get maintenance then. Now, that would have been four years into the six when he would have done that. Would he have come back for two years? I don't think so. Lastly, on the issue of attorney's fees. If you look at Mr. Morrow's budget in his affidavit, he budgets $2,500 a month for attorney's fees. He claims he owed $27,000. Mr. Morrow was a cash man. That was one of the things that we brought up, one of the things at trial. In fact, he couldn't even explain his last paycheck before trial. He got $3,000. He didn't know what he did with it. He put $600 in the account because that we could trace. The rest of it he couldn't explain because he's a cash man. Cash people are hard to substantiate affidavits. You can't prove he does this. So he claims he's paying $2,500 a month for attorney's fees. That's in his budget. Ten months, he's done. My client came back with a boatload of fees too, owed me a bunch. It's going to take her ten months too. Her budget was $1,000, unfortunately. But she was going to do it over time. That's what people do. She didn't have any money to pay it. She didn't have any money that she'd go out and come and pay off his and pay off hers. I think the court did the right thing on attorney's fees. We ask the court to affirm. Thank you. Thank you, counsel. Any rebuttal, Ms. Jerry? I'll try to be quick. First of all, one thing to keep in mind here is that Dr. Green has a medical practice that she built during the marriage, as a result of which she's earning about $300,000 a year. And Mr. Scott talked about she had a six-month period where she earned less, and that is true. But also at the time of trial, she was earning at a rate of $313,000 a year. She had earned $300,000, excuse me, $319,000 the year before. The judge found that she made three times what Mr. Morrow made, and I think that's a fair estimate. With regard to the statement that Mr. Morrow had budgeted in his affidavit $2,500 a month against attorney's fees, if you look at his affidavit, he does not have the income, the net income from his employment, to pay that $2,500 a month. And because the court did not give him an award of attorney's fees, did not give him maintenance, he doesn't have the money to pay what he may have budgeted. He's going to have to invade assets to do it, and the only asset at this point that he has to invade is retirement. Now Mr. Green, excuse me, Mr. Scott argues that with regard to the pension. He's got $300,000 or so in retirement. He can use that to live on if he retires at age 60. If he does that, he's diminishing that asset for later in life. There's no evidence, by the way, Justice Connick asked what evidence there was about his retirement other than him saying he wasn't going to retire at 60. There was not evidence of what kind of cash flow that retirement money would make. There was not evidence of what additional pension might be accumulated, but I would note that a state employee only accumulates 1.67% of their salary each year. So we're not talking about, on his pension, a huge accumulation of additional retirement monies between the date of the trial and his age of 60. With regard to his living expenses, yes, he is paying for the storage unit. Yes, that is a burden that he's got. He's got to try to figure out how to get rid of that, but none of our arguments have been, oh, let's have money for him to pay the storage unit. He's doing that rather than getting a place to live. He's suffering not getting a place to live in order to pay for that, but what should be looked at is for him to maintain the lifestyle of the marriage, which would include having a house that he can have his kids in, a house comparable to the marital residence, what the cost of that would be. And with that taken into account, his affidavit, he has figures for that house, if he had that separate housing, what it would be. So take out the storage unit cost, just use that, and he still doesn't have the income to meet his expenses, particularly if he has to pay the attorney's fees, because it's not only attorney's fees to me. There's a credit card debt he incurred making payments on attorney's fees. And again, when Mr. Scott's talking about all of the expenses that Dr. Green is paying for the children, again, she makes much more money than he does, and this is an appropriate case for there not to be an award of child support, even if you take into account the income he would have if he was being paid maintenance. Because even with that, she makes three times more than he does gross. She would have twice as much as him, even after making her retirement contribution. And by the way, Mr. Scott mentioned something about she won't have billed retirement. She's making profit-sharing contributions. It was $34,000 in 2014 based on her $313,000 income. So that net income that we talk about is after she makes those retirement contributions. So she's still building retirement. She has twice as much as he has in order to meet her expenses and those of the children, including her expense for her vacation home, including a course, including writing lessons, including various things that she has which are the appropriate lifestyle for the children. And Mr. Scott is suggesting that Mr. Morrow should keep living with his mother, not have the housing costs, pay off the storage, pay off his attorney's fees, and that's the appropriate resolution of the Division of Marital Estate in letting these two people go on in their lives, and I would submit that that's not an equitable division. And again, we get back to the retirement division. While there can be an amount calculated by accountants, that does not necessarily mean that that's the amount that's appropriate to use, and that was recognized in CORPA, in Remarriage of CORPA. It was also recognized by the Supreme Court in Avril. It wasn't exactly the same issue when I discussed it in the brief. But the whole point is just because you can calculate a number, it doesn't mean it's the proper number to use if it's based on a faulty premise or speculative premise. Thank you. Thank you, counsel. We'll take this matter under advisement and be in recess until the next case.